UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                  )
D & H THERAPY ASSOCIATES, LLC )
and ROBIN DOLAN,                  )
         Plaintiffs,              )
                                  )
     v.                           )      C.A. No. 08-05 S
                                  )
BOSTON MUTUAL LIFE                )
INSURANCE COMPANY,                )
         Defendant.               )
_____)

MEMORANDUM AND ORDER

WILLIAM E. SMITH, United States District Judge.

     This matter is before the Court on the parties' cross motions.
Defendant moves for summary judgment on Plaintiffs' Amended
Complaint, and moves to strike certain affidavits and exhibits
submitted by Plaintiffs on the grounds that these documents are not
part of the administrative record.   In addition, Defendant has
filed a counterclaim for $145,958.32, representing benefits it
alleges were overpaid to Plaintiff Robin Dolan.   Plaintiffs object
to Defendant's motions for summary judgment and to strike their
submissions, and cross move for summary judgment on Defendant's
counterclaim, and as to liability on three counts of their five-
count complaint.

     In her Complaint, Plaintiff Robin Dolan ("Dolan") alleges that
her long-term disability insurance benefits were wrongly terminated
by Defendant Boston Mutual Life Insurance Company ("Boston
Mutual").   Dolan is a 50% partner in several physical therapy

clinics operating as D & H Therapy Associates, LLC ("D & H"), which
sponsored and administered the long-term disability plan, and which
joins Dolan in her suit against Boston Mutual.    Dolan twice
appealed the termination of benefits to Boston Mutual's third-party
claims administrator, Disability Reinsurance Management Services
("DRMS").   Unsuccessful in those efforts, she now appeals the
termination to this Court.

Background

Robin Dolan is a physical therapist, who with a partner, Kim
Havunen, created several related business enterprises, of which
they were each 50% owners.   Associated Professional Management,
Inc., ("APM") is an S corporation,[1] and D & H Therapy Associates
was originally a partnership.   In 2004, the D & H partnership was
converted to the Plaintiff entity, a limited liability company.[2]
D & H provides physical, occupational, and speech therapy at
several clinics located throughout Rhode Island.   When Dolan was
actively employed by D & H, she served as director of clinical
services and as a physical therapist.   She received a salary based
on the hours she worked in those capacities, which was not

---

[1] An S Corporation is a small business corporation so
designated by the Internal Revenue Code to distinguish it from more
common C corporations.   See I.R.C. § 1363.

[2] References to "D & H" will be to both entities, unless
otherwise specified.

connected to her ownership interests in the businesses. Her partner Havunen handled the companies' business operations.

In 2000, Havunen, working with insurance agent Benefits Services, Inc., obtained a group long-term disability insurance policy from Boston Mutual. The Boston Mutual policy was designed to replace similar coverage provided to D & H staff by Guarantee Life Insurance Company ("Guarantee Life") under a policy that was up for renewal. Havunen recalls having extensive discussions with her insurance agent on a key aspect of these policies. Specifically, Havunen understood that the Guarantee Life policy defined earnings in such a way as to safeguard employees' salary, or W-2 income, so that, in the event of disability, their annual income would be protected, even as profits from the physical therapy clinics went up or down. Havunen asserts that she only agreed to replace the existing policy with the new Boston Mutual policy when she was assured by Boston Mutual's agent that the coverage would be the same. Despite the many disputes between the parties concerning the policy and its coverage, both sides agree that the policy comprises an employee welfare benefit plan, as defined by the Employee Retirement Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

In 2001, Dolan underwent knee surgery. She took six months off, and then returned to work part-time on August 20, 2001. In accordance with the terms of the Boston Mutual policy ("the Plan"),

Dolan began to receive disability benefits on a monthly basis. In 2006, Boston Mutual discontinued Dolan's disability benefits following an audit of Dolan's business and personal income tax returns from the years 2001 through 2004. The audit was conducted by DRMS, which submitted Dolan's tax returns to CPA Judy Bogdanovich of Cardamone Risk Management Consulting Services. Bogdanovich determined that the benefits paid to Dolan over the past four years had been based exclusively on her post-disability W-2 wages. However, Dolan's tax returns revealed the receipt of both shareholder income from APM and partnership income from D & H that Bogdanovich believed should have been considered when calculating the proper benefit amount. When the business profits were included, Dolan was making considerably more than she had earned in pre-disability wages, at least for some of the years in question. DRMS concluded that Dolan was not entitled to any benefits after January 1, 2002. When Boston Mutual advised Dolan of the results of the audit by letter dated August 25, 2006, it also noted its right under the Plan to recover overpayments made as a result of fraud or error.

Recalling their insistence that the Plan's definition of "earnings" include salary income only, Plaintiffs objected strenuously to Defendant's interpretation of the Plan language, which calculated monthly disability benefits by comparing pre-disability W-2 earnings to the combined total of post-disability W-

-4-

2 earnings and shareholder and partnership profits.   Plaintiffs, through their attorney by letter dated October 2, 2006, argued that income from the partnership and the S corporation should not be considered "employment earnings" as defined by the Plan.  Moreover, Dolan asserted that the shareholder income reflected in her tax returns was "paper" or "phantom" income only, and that she had not actually received any of this income.

The dispute between the parties escalated, with Defendant carrying out surveillance on Dolan and charging her with lack of cooperation in producing requested financial records.  On October 27, 2006, Boston Mutual discontinued benefits payments, and demanded that Dolan repay $145,958.32 in benefits received after January 1, 2002.  Dolan appealed the termination of benefits on December 13, 2006.  After another review and report from Bogdanovich, Boston Mutual denied Dolan's appeal on May 1, 2007, stating that Dolan was not eligible for benefits after December 31, 2001.

Dolan again appealed the termination of benefits on June 28, 2007.  On September 21, 2007, Hanuven submitted additional information concerning Dolan's role in the companies.  Bogdanovich again reviewed the file and confirmed that, as of 2002, Dolan was ineligible for disability benefits based on her monthly income. Boston Mutual also referred Dolan's file to a doctor for a medical review, and to a vocational consultant to determine her ability to

-5-

carry out the various functions of her occupation. Those reviews
indicated that Dolan was unlikely to be able to work again as a
physical therapist. However, on November 29, 2007, Boston Mutual
upheld the termination of Dolan's benefits, based on its financial
analysis of her post-disability income. In addition, Boston Mutual
noted that the additional material submitted by Hanuven
demonstrated that Dolan was continuing to perform many of her
duties as partner and director of clinical services for the
businesses. On January 3, 2008, Dolan and D & H filed this
lawsuit. Dolan's physical condition has worsened over time and she
is now completely unable to work. Since February 24, 2008, she has
not been employed by D & H in any capacity; nor has she received a
salary from D & H.

The Amended Complaint, Counterclaim and Motions

In their five-count Complaint, Plaintiffs allege that
Defendant breached the insurance contract (Count I), that the
denial of benefits has no reasonable basis and was made in bad
faith (Count II), and that they were fraudulently induced to give
up their previous insurance coverage by Defendant's assurances that
its coverage would replicate the Guarantee Life policy (Count V).
In addition, Plaintiffs seek declaratory relief (Count III), and
recovery of the benefits that they are entitled to pursuant to 29
U.S.C. § 1132 (Count IV).

-6-

Defendant's counterclaim demands reimbursement of its overpayment of benefits to Dolan in the amount of $145,958.32. Its Motion for Summary Judgment calls for the dismissal of all the claims in the Complaint, and judgment in its favor on the counterclaim. Defendant has also filed a Motion to Strike four affidavits submitted by Plaintiffs, along with four appended exhibits, as well as all references to these affidavits and exhibits in Plaintiffs' memoranda. The disputed documents all bear on Plaintiffs' state law claim of fraudulent inducement, and are offered to establish what kind of coverage was provided by the Guarantee Life insurance policy, and to shed light on the negotiations that took place between Boston Mutual and D & H. Defendant objects to these documents because they were not included in the administrative record reviewed by DRMS in connection with Dolan's two previous appeals, which is typically the exclusive record under review in an ERISA action.

Plaintiffs move for partial summary judgment as to liability on Counts III, IV and V of their Amended Complaint. They object to Defendant's Motion for Summary Judgment and to Defendant's Motion to Strike their documents provided in support of the fraudulent inducement claim. On March 16, 2009, during oral argument before this Court on the cross Motions for Summary Judgment, Plaintiffs' counsel conceded that their Counts I and II, which sound in state law, are preempted by ERISA, and that Count III for declaratory

judgment could be merged into Count IV for recovery of benefits. Consequently, the Court will focus on Counts IV (now merged with Count III) and V, as well as on Defendant's counterclaim and the issue of whether or not Plaintiffs' extrinsic evidence may be considered or must be stricken.

Standard of Review

The standard of review employed by the Court for summary judgment on an ERISA case requires slightly more explication than the routine boilerplate.  It has been well established that where the ERISA plan administrator has discretion to determine eligibility for benefits, those determinations will be reviewed by the court only for an abuse of discretion.  <u>See</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989).  It is undisputed that, in the case before the Court, Boston Mutual has such discretion, although that responsibility was delegated to a third party claims administrator, DRMS.

The First Circuit uses the "abuse of discretion" standard interchangeably with the "arbitrary and capricious" standard. <u>Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005).  Elaborating on the standard, the <u>Wright</u> Court stated,

> A decision to deny benefits to a beneficiary will be upheld if the administrator's decision "[was] reasoned and supported by substantial evidence." . . . Evidence is substantial when it is "reasonably sufficient to support a conclusion."  Evidence contrary to an administrator's

-8-

decision does not make the decision unreasonable, provided substantial evidence supports the decision.

402 F.3d at 74 (quoting <u>Gannon v. Metro. Life Ins. Co.</u>, 360 F.3d 211, 213 (1st Cir. 2004)). Consequently, the task of this Court is not to determine whether Defendant's interpretation of the Plan language is the correct one; rather, only if that interpretation is a reasonable one. See <u>Buffonge v. Prudential Ins. Co. of Am.</u>, 426 F.3d 20, 31 n.13 (1st Cir. 2005).

<u>Metropolitan Life Insurance v. Glenn</u>

The Supreme Court's recent decision in <u>Metro. Life Ins. Co. v. Glenn</u>, 128 S. Ct. 2343 (2008), requires the Court to take a harder look at the deference it accords to Boston Mutual's decision. In <u>Glenn</u>, a bare majority of the Court cautioned lower courts to pay particular attention to conflicts of interest created when an entity, such as an insurance company, serves both as the ERISA plan administrator charged with making benefits decisions, and as the payor for those benefits.

> Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.

128 S. Ct. at 2346. Although the Supreme Court was emphatic that this scenario invariably creates a conflict, the Court was less

-9-

clear on how this conflict should be considered when determining the level of deference accorded to a plan administrator. The Court did not depart from the <u>Firestone</u> formula of weighing the conflict as one factor in determining whether there has been an abuse of discretion. <u>Id.</u> at 2350. Underscoring that the new decision refrains from overturning <u>Firestone</u> and creating a new rule which would require <u>de novo</u> review of every case, the Court wrote,

> Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict. In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account.

<u>Id.</u> at 2351. The Court concluded its somewhat murky analysis by quoting a judicial apology from an earlier decision in <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951):

> The Court added that there "are no talismanic words that can avoid the process of judgment." It concluded then, as we do now, that the "[w]ant of certainty" in judicial standards "partly reflects the intractability of any formula to furnish definiteness of content for all the impalpable factors involved in judicial review."

<u>Id.</u> at 2352.

Concurring in the judgment, Chief Justice Roberts complained that the decision "leaves the law more uncertain, more unpredictable than it found it." <u>Id.</u> at 2354. Justice Scalia, joined by Justice Thomas, dissented, calling the majority's approach "nothing but <u>de novo</u> review in sheep's clothing." <u>Id.</u> at 2358. Pointing out that the mere existence of a conflict is not

evidence of an improper motive on the part of the plan administrator, Justice Scalia explained that, "[c]ommon sense confirms that a trustee's conflict of interest is irrelevant to determining the substantive reasonableness of his decision. A reasonable decision is reasonable whether or not the person who makes it has a conflict." Id. at 2360.

As of this writing, the First Circuit has yet to issue a decision applying Glenn. In a post-Glenn decision from Pennsylvania's District Court, Dolfi v. Disability Reinsurance Mgmt. Servs., Inc., 584 F. Supp. 2d 709 (M.D. Pa. 2008), the court determined, based upon Third Circuit precedent, that the plaintiff bore the burden of demonstrating the plan administrator's conflict of interest. 584 F. Supp. 2d at 730. However, this holding does not seem consistent with the Supreme Court's assertion: "We here decide that this dual role creates a conflict of interest." Glenn, 128 S. Ct. at 2346. If the conflict is inherent, then neither party need demonstrate or refute it.

The Dolfi Court distinguished Glenn based upon the fact that the insurance company had distanced itself from the potential conflict by contracting with a third-party administrator[3] to handle the claims administration process, including final approval of all claims. Dolfi, 584 F. Supp. 2d at 731. "This kind of

---

[3] The third-party administrator in Dolfi was Disability Reinsurance Management Services, the same company that administers Defendant Boston Mutual's claims.

arrangement," the Court wrote, "does not ordinarily give rise to a conflict of interest."   Id.

After digesting this material, this Court has concluded that the deferential standard remains the appropriate standard of review for the decision of a plan administrator vested with discretion over benefit determinations.   In accordance with the directives of Glenn, the Court considers Boston Mutual's conflicting motivations to act as a fiduciary on behalf of its policyholders while at the same time maximizing its company's profits.   A benefits determination motivated by an insurer's desire to maximize corporate profits would be one where the plan administrator abused his or her discretion.   Consequently, this Court will review the material submitted by the parties and determine whether or not Boston Mutual's termination of Dolan's benefits was reasonable and supported by substantial evidence.   If Boston Mutual's benefits decision was reasonable and supported  by the evidence, then the Court concludes that it did not abuse its discretion by making a determination motivated by a desire to maximize corporate profits.

Plan Timetables

Plaintiffs argue that the Court must review the plan administrator's decision using a de novo standard of review because the decision was not made within the time frames set forth in the Plan, which requires that review must take place within 45 days. This time frame is codified by Department of Labor regulations at

29 CFR § 2560.503-1(i)(3)(i), which require reviews of benefits determinations to be completed within 45 days, with one possible 45-day extension.  Defendant responds that, during both appeals, it was waiting for requested information from Dolan, which request tolls the time limit, pursuant to 29 CFR § 2560.503-1(i)(4).

Plaintiffs rely on Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 349 F.3d 1098 (9th Cir. 2003), where the Court of Appeals ruled that a de novo standard of review should be used when the plan administrator was so dilatory in making a benefit determination that the claim was eventually "deemed denied" under the operative plan language and regulation. In such a case, the Court reasoned, there had been no exercise of discretion by the plan administrator that could be accorded a deferential review by the court.  Id. at 1106.  The Code of Federal Regulations § 2560.503-1(h)(1)(i) (1998) provided that if the plan administrator did not provide a claimant with a response within a certain time frame, then the claim was "deemed denied" for purposes of proceeding with an appeal.  That language was dropped in 2000, when the regulation was amended to indicate that, under those same circumstances, the claimant was deemed to have exhausted administrative remedies.  See CFR § 2560.503-1(l) (2000).  The new version of the regulation, which governs all claims submitted on or after January 1, 2002, also shortened the permissible time frames from 60 days to 45 days.  See CFR § 2560.503-1(i)(3)(1) (2000).

-13-

Dolan filed her original claim during 2001; it was initially
approved by Boston Mutual in January 2002, and benefits were
retroactive to August 2001. However, extensive analysis as to
which version of the Code of Federal Regulations should govern
Dolan's claim is not necessary, because the Court has determined
that Boston Mutual substantially complied with the regulations,
whichever version applies.

Dolan's benefits were terminated August 2006. She filed her
first appeal on December 18, 2006. On February 2, 2007, DRMS
requested an additional 45 days to decide the appeal. In its
letter, DRMS notes that it had previously advised Dolan that it
needed records reflecting the gross billings for various D & H
locations, and that it was still waiting for those documents. It
appears from various e-mails in the record that, during the second
week of March 2007, DRMS and Dolan's attorney agreed that the
review would go forward without the additional documentation. The
review then commenced around March 14. The appeal was denied on
May 1, 2007 - 133 days after it was filed. Pursuant to CFR §
2560.503-1(i)(4), the time limit is tolled between the time the
extension is requested and the receipt of any additional
information requested from the claimant. In this case, DRMS
requested an extension on February 2 and abandoned its request for
gross billings around March 14. Deducting this forty-day period
from the total brings the total time period to 93 days.

-14-

The second appeal was brought on July 2, 2007, and denied on November 29, 2007 – a period of 150 days.   However, as seems appropriate on a second appeal, on July 5, Boston Mutual requested that Dolan submit any additional information that she wished to have considered.   This request was repeated on August 3, and again on September 7.   On September 21, 2007, Dolan submitted a letter supporting her claim.   On October 25, 2007, Boston Mutual requested an extension; then denied the claim 35 days later.

Plaintiffs cite two cases in support of their argument for a de novo review for "deemed denied" claims, Jebian, 349 F.3d 1098 and Gilbertson v. Allied Signal, Inc., 328 F.3d 625 (10th Cir. 2003).   Both cases indicate that minimal violations of the deadlines "in the context of an ongoing, good faith exchange of information between the administrator and the claimant" do not entitle claimants to de novo review. Gilbertson, 328 F.3d at 635; see also Jebian, 349 F.3d at 1107.

> Courts have also been willing to overlook administrators' failure to meet certain procedural requirements when the administrator has substantially complied with the regulations and the process as a whole fulfills the broader purposes of ERISA and its accompanying regulations.

Gilbertson, 328 F.3d at 634.

The "substantial compliance" approach was endorsed by the District Court of Massachusetts in Papadopoulos v. Hartford Life Ins. Co., 379 F. Supp. 2d 117 (D. Mass. 2005).   The Court rejected Papadopoulos' argument, based on Jebian, that a de novo review was

proper when Hartford Life took 145 days to decide his appeal.  <u>Id.</u>
at 124.  Although the First Circuit has yet to rule on this issue,
it favored the "substantial compliance" approach when evaluating an
analogous procedural violation in <u>Terry v. Bayer Corp.</u>, 145 F.3d
28, 39 (1st. Cir. 1998).  In <u>Kieft v. Am. Express Co.</u>, 451 F. Supp.
2d 289 (D. Mass. 2006), the District Court used a <u>de novo</u> standard
when the plan administrator failed to undertake any review on
claimant's appeal.  "But this case is unique," the <u>Kieft</u> Court
wrote, "in that American Express, and MetLife as administrator of
the LTD Plan, never made any effort to analyze Kieft's claim.
Thus, there is no analysis or reasoning to which this Court can
defer under the arbitrary and capricious standard."  451 F. Supp.
2d at 295.

This Court concludes that the period of time that Boston
Mutual required to rule on Dolan's appeals, given that at least
some of that time Boston Mutual was waiting or negotiating over
requested material from Dolan, was in substantial compliance with
the time frames set forth in the CFR § 2560.503-1, and that,
consequently, the "abuse of discretion" standard of review is
proper for this appeal.

The Summary Judgment Standard of Review

It still remains for this Court to square the deferential
standard of review appropriate to this ERISA case with the standard
of review used in a summary judgment proceeding.  Generally

-16-

speaking, when ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). However, for ERISA cases, the First Circuit has determined that a different procedure is appropriate:

> [I]n an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor.

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005) (internal citations omitted). Pointing out the "obvious discongruence" between the "arbitrary and capricious" standard and the summary judgment standard in Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002), Judge Selya paused to explain how to review the evidence in these types of cases:

> The degree of deference owed to a plan fiduciary is an underlying legal issue that remains the same through all stages of federal adjudication. By contrast, summary judgment is a procedural device designed to screen out cases that present no trialworthy issues. In an ERISA benefit denial case, trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court.
>
> . . . .
>
> [T]he district court must ask whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.

315 F.3d at 17-18.   The Court will proceed accordingly.

Cross Motions for Summary Judgment<br>Count IV of the Amended Complaint

The crux of Plaintiffs' complaint is that Dolan's long term disability benefits were wrongfully terminated when Boston Mutual changed its method of calculating earnings to include partnership and shareholder distributions, in contravention of the Plan's definition of "earnings."   Defendant disputes Plaintiffs' interpretation of the Plan language, explaining that, based on insufficient documentation from Dolan, it mistakenly paid her benefits for a period of time during which her earnings exceeded the limits.   Defendant did not change its interpretation of Plan language, it explains, but rather the overpayment was not discovered until the audit was performed by DRMS' accountant in 2006.   For reasons the Court will discuss below, the Defendant's interpretation of the Plan language is not only reasonable, but the most sensible interpretation when the language is analyzed in context and the Plan is analyzed as a whole.

The Plan

Basically, the Plan operates by providing a claimant with a percentage of the amount of money he or she was making before the onset of the disability.   Pre-disability earnings provide the basis from which the post-disability benefit is calculated.   The Plan states in Section 1:

-18-

> Pre-disability earnings means your monthly rate of earnings from the employer in effect just prior to the date disability begins.  Basic annual Earnings shall mean the Insured Person's earnings for the prior calendar year as reported by the Group Policyholder on form W-2, excluding commissions. ... Our payments to you will be based on the amount of your pre-disability earnings covered by this plan and for which premium has been paid.

When they decided to purchase the Boston Mutual insurance policy, Plaintiffs were adamant that "earnings" mean W-2 earnings, and this paragraph no doubt appeared satisfactory to them.  Section 1 also provides that all employees covered by the Plan[4] receive a benefit percentage of 60%, up to a maximum of $6,000 a month.  Just beneath the $6,000 figure, the Plan states, "We may reduce the amount we pay to you by other income amounts and any income you earn or receive from any form of employment."

Section 4 of the Plan provides three different scenarios for benefits calculations depending upon the amount the claimant is able to work, and how long the period of disability has lasted. These scenarios may be summarized as follows:

> 1.  If you are not working or working and earning less than 20% of your pre-disability earnings, then multiply your pre-disability earnings by the benefit percentage. As long as this is less than $6,000, that's your gross monthly payment.  (If it's more than $6,000.00, then your gross monthly payment is $6,000.00.)  Finally, "[S]ubtract from the gross monthly payment any other income amounts except any income you earn or receive from any form of employment.  This is the payment that you may receive."

---

[4] Partners (Class I) and full time employees (Class II) were treated the same under the Plan.

-19-

2.   If you are working and earning between 20% and 80% of
your pre-disability earnings, then:

a) For the first 24 months, multiply your pre-disability
earnings by the benefit percentage.  Then take your pre-
disability earnings and "subtract any other income
amounts including current income you earn or receive from
any form of employment."  The lesser of these two figures
is your benefit (not exceeding $6,000.00).

b) After 24 months, calculate your gross monthly payment
by multiplying your pre-disability income by the benefit
percentage (again, not exceeding $6,000.00).   Then,
subtract from the gross monthly payment:

> - 100% of any other income amounts except any
> income you earn or receive from any form of
> employment; AND

> - 50% of any income you earn or receive from any
> form of employment.

The next pages of the Plan provide six categories of "other income

amounts," including one that is critical to the present analysis:

5.   Any income you earn or receive from any form of
employment.  We may require you to send us proof of your
income.  We will adjust our payment to you based on this
information.  As part of the proof of income, we can
require you to send us appropriate tax and financial
records we believe we need to substantiate your income.

Section 4 also provides in a boldfaced, all-capitalized, paragraph:

**"IF YOU ARE DISABLED AND WORKING, EARNING MORE THAN 80% OF YOUR**

**PRE-DISABILITY EARNINGS, NO PAYMENT WILL BE MADE."**[5]

A provision that is key to Plaintiffs' argument comes later in

Section 4, under the heading "WHEN WILL OUR PAYMENTS TO YOU STOP?"

---

[5] Defendant asserts that as of January 1, 2002, Dolan's post-
disability income exceeded 80% of her pre-disability earnings,
thereby disqualifying her for benefits pursuant to this section of
the Plan.

The third bullet point on this list, is: "• the date your current earnings exceed 80% of your pre-disability earnings." Plaintiffs argue that "earnings" has already been defined in the Plan as the "monthly rate of earnings from the employer . . . as reported by the Group Policyholder on form W-2." Therefore, Plaintiffs reason, when the Plan speaks of "current earnings" exceeding "80% of pre-disability earnings," then "earnings" must mean W-2 wages both before and after disability. If the word "earnings" were a technical term of art, Plaintiffs' argument might have more force. But it is irrefutably clear from the benefit calculation scenarios in the earlier portion of Section 4 that the objective of the Plan is to deduct certain income, including earnings, from the benefit amount under certain circumstances.

The circumstances of Dolan's disability and career provide an excellent example of the scenario that the alternative terms of the Plan were designed to address. She and her partner started their physical therapy business in 1985. In the beginning, they each did much of the "hands-on" work themselves, and Dolan did much of the actual physical therapy. The company grew, additional clinic locations were added, and new staff came on board. Dolan was a physical therapist, the Director of Clinical Services, and a member of the board of directors. When she became disabled, she was unable to continue the physical therapy work, but she was able to continue working in a managerial capacity for as much as 20 hours

-21-

per week, overseeing the work of other physical therapists and
contributing to the growth of the business. Her role was explained
by her partner, Kim Hanuven, in the September 7, 2007, letter
Plaintiffs submitted to DRMS in connection with Dolan's second
appeal:

> Robin has maintained the title of Director of Clinical
> Services; her responsibilities under this title have been
> limited to handling extreme clinical issues that require
> a final attempt at resolution. Robin dedicated many
> years of her professional career providing services to
> our clients, establishing an extremely reputable and
> credible company. It is not our posture to demean
> someone further who has given so extensively of
> themselves and continues to contribute to the best of
> their ability to the organization by stripping them of
> their title and dignity because they have experienced the
> types of events that have caused her to limit her work
> capacity. While she is no longer able to contribute to
> that level, her knowledge, expertise and experience has
> value and remains part of her employed position for which
> she received compensation. Additionally, she is a well
> respected clinician and the fact that we are able to
> continue to promote with her name brings additional
> credibility and stability to the organization.

This paragraph illustrates plainly the tangible and intangible
contributions that Dolan continued to make to D & H Therapy after
her disability made it impossible for her to perform the tasks of
a physical therapist. While Dolan's W-2 wages decreased, the
distributions from the partnership and shareholder income from the
S corporation continued and even increased, as the businesses grew.
This income is "income you earn or receive from any form of
employment," and so must be considered in the calculations for the
monthly benefit. According to Defendant's auditor, a review of

Dolan's 2002 tax return indicated that she received 50% of the shareholder net income from APM and 50% of the net income generated by D & H.   Combined, her monthly average income from the two business enterprises was $4,754 a month for 2002.   In addition, she earned payroll or W-2 wages of $2,916 a month, for a total monthly income of $7,670.   Pre-disability base pay was $5,833 a month.[6] The auditor also pointed out, as a basis for comparison, that Dolan's 50% partner Hanuven's earnings increased 18.9% in 2003, and 82% in 2004.   APM total revenues in 2002 were over $2 million; by 2005, those revenues had increased to $3.3 million.

### Phantom Shareholder Profits

Dolan swears that she never received any partnership or shareholder income or business profits from APM or D & H.   She describes these earnings as "phantom income" or "paper-only income," and says it showed up on her Form 1040 tax return and she was taxed on it, but these profits were reinvested in the businesses.  Defendant's response is that it was her income and her choice as to what she did with it.   Defendant argues that this income fits the Plan's definition of "earnings" because the distribution not only represents a return on Dolan's financial

---

[6] DRMS performed another set of calculations for pre-disability earnings, using all income including business profits, which brought the pre-disability earnings figure to $8,073. Compared with the post-disability figure of $7,670, this also does not represent a 20% loss of income.

investment in the businesses, but it also represents compensation for Dolan's ongoing management role in the companies.

According to Bogdanovich, DRMS's consulting CPA, the partnership income from D & H, whether distributed or not, is considered by the IRS as net income, subject to self-employment tax. Likewise, shareholder income, from the S Corporation APM, must be reported on the tax return as net income, whether it is distributed or not. Because a shareholder who works for the business is considered an employee, shareholder "pass-through" income is not considered self-employment income by the IRS.

Plaintiffs attempt a legal argument to buttress their claim that business profits should not be counted as income. In reliance on Durando v. United States, 70 F.3d 548 (9th Cir. 1995), Plaintiffs assert that it is well-established that S corporation income is not treated as employment income or earnings by the IRS or the Social Security Administration, or amongst accountants. Durando holds that while S corporation pass-through earnings are included in a shareholder's gross income, they should not be considered self-employment earnings for purposes of calculating the proper deductions for a Keogh retirement plan. 70 F.3d at 552. This narrow holding, that shareholder income is not the same as self-employment income pursuant to the Internal Revenue Code, can not be stretched to apply to the present dispute.

Defendant cites <u>Nu-Look Design, Inc. v. Comm'r of Internal Revenue</u>, 356 F.3d 290, 293 (3rd Cir. 2004), which holds that the sole-shareholder of an S corporation was subject to employment taxes on his shareholder income, because he was an employee of the S corporation and performed substantial services in that capacity. <u>See also Veterinary Surgical Consultants, P.C. v. Comm'r</u>, 117 T.C. 141, 146 (2001).   While the holdings of these cases are also narrow, they do refute Plaintiffs' argument that the IRS does not treat S corporation income as earnings.

Regardless of how the IRS calculates shareholder income, self-employment taxes, Keogh Plan deductions, etc., these cases are only passingly relevant to the present inquiry and none of these decisions is binding on this Court.   The controlling and operative language for the purposes of the present case must come from the Plan.   Dolan asserts that she did not actually receive any of the partnership or shareholder income, and it may very well be that she and Hanuven decided to put their "paper profits" back into the businesses.   However, Defendant's conclusion that the shareholder and partnership profits are income, under the policy's definition of "other income you earn from any form of employment," is a reasonable one.

Consequently, because the Defendant's interpretation of the Plan language is a reasonable one, the Court holds that summary judgment may be granted in favor of Defendant on Count IV of the

Amended Complaint, for the recovery of Plan benefits pursuant to 29 U.S.C. § 1132.  Plaintiffs' Motion for Partial Summary Judgment on Count IV is denied.

Count V:  Fraud in the Inducement and
Defendant's Motion to Strike

Plaintiffs' Count V alleges they relied on Defendant's representations that the Plan's coverage was the same as that provided under the Guarantee Life policy, and the word "earnings" would be interpreted as W-2 earnings only and "would not include other investment or similar income."  (Am. Compl. ¶ 35.) Plaintiffs do not seek Plan benefits as a remedy for this claim. Instead, they seek as compensation the benefits Dolan would have received under the Guarantee Life policy, had Plaintiffs not been induced to terminate that policy in favor of Defendant's policy. Before reaching the substantive merits of this claim, the Court must first determine whether or not it is preempted by ERISA.

ERISA Preemption

It is well established that ERISA was designed by Congress to "supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a); ("ERISA § 514(a)").  In addition, state laws that operate to provide an alternative mechanism for the enforcement of an ERISA plan are completely preempted under ERISA's civil enforcement provision, 29 U.S.C. § 1132 (a); ("ERISA § 502(a)").  Plaintiffs attempt to circumvent § 502(a) preemption of their fraudulent

inducement count by claiming that damages must be measured by the Guarantee Life policy, rather than by the benefits allegedly due under the terms of the Boston Mutual Plan.

However, Plaintiffs' claim may still be preempted by ERISA § 514(a) which preempts "laws that present the threat of conflicting and inconsistent regulation that would frustrate uniform national administration of ERISA plans." Danca v. Private Health Care Sys., Inc., 185 F.3d 1, 7 (1st Cir. 1999) (citing New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656-58 (1995)).

The First Circuit held that a claim of negligent misrepresentation was preempted by ERISA in Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790 (1st Cir. 1995). In that case, Carlo decided to accept an early retirement offer from his company based on the personnel manager's assertion of an expected monthly benefit figure - a figure which the personnel manager stated had been certified by the corporate program administrator.   When Carlo retired and discovered that his retirement benefit was significantly less than he had been told, he sued in state court for breach of contract and negligent misrepresentation.   The Carlo Court began its analysis by referring to the Supreme Court's decision in Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990), where the Supreme Court held that "a law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such

a plan," or "where the court's inquiry must be directed to the plan." 49 F.3d at 793.  While acknowledging that courts in other states and other districts have permitted negligent misrepresentation claims to go forward in ERISA contexts, the Carlo court concluded,

> Despite these cogent arguments against preemption in misrepresentation claims, we nevertheless find that ERISA preempts the Carlos' claims because they relate to an employee benefit plan.  ERISA's deliberately expansive preemption language was designed to establish pension plan regulation as exclusively a federal concern.

49 F.3d at 794, (internal quotations omitted) (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987)).  The First Circuit explained further that, "[i]f the Carlos were successful in their suit, the damages would consist in part of the extra pension benefits which Reed allegedly promised him." Id. at 794.  The Carlos argued that their claim was a contractual claim for promised benefits, not an ERISA claim for the enforcement of benefits due.  But this argument was rejected by the Court, which stated that it would be necessary to refer to the Plan in order to compute those damages. Id. at 794.

The First Circuit again determined that state law claims were preempted by ERISA in Otero Carrasquillo v. Pharmacia Corp., 466 F.3d 13 (1st Cir. 2006).  Along with his ERISA claim for benefits, Otero sued his former employer for fraudulent misrepresentation and intentional infliction of emotional distress after he was denied separation benefits after a plant closing.  Otero argued that he

-28-

believed he was entitled to benefits based on a Spanish language version of the Plan, which had been circulated around the Puerto Rico pharmaceutical plant.  The First Circuit denied Otero's claim for benefits due under ERISA, and dismissed his tort claims based on § 514(a) preemption.  In his complaint, Otero alleged that his supervisor had induced him to continue working at his position by promising him a comparable position at the new plant in the States, and misleading him about the deadline for applying for severance benefits.

> To determine whether these acts constitute fraudulent
> inducement, the district court would have to consult the
> severance plan to identify the application dates and the
> administrative process for determining and informing the
> employees of such dates.  Additionally, to determine
> whether Pharmacia's promises of comparable employment
> were fraudulent, the court would have to consult the Plan
> to determine whether the offered microbiologist position
> was "comparable" to his prior job as a research
> associate.  Because the court's inquiry would necessarily
> "be directed to the Plan," the court was correct to
> dismiss the fraudulent inducement claims.

466 F.3d at 20 (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. at 140-42.)

In the oft-cited Ingersoll-Rand case, the plaintiff brought several state law tort and contract claims after his employer terminated him four months before he was to become vested in his company's pension plan.  Seeking future lost wages and punitive damages, McClendon claimed his employer discharged him in order to avoid making contributions to his pension fund.  498 U.S. at 135-36.  The Supreme Court held that McClendon's claim was preempted

-29-

because, "the existence of a pension plan is a critical factor in establishing liability under the State's wrongful discharge law. As a result, this cause of action relates not merely to pension benefits, but to the essence of the pension plan itself." Id. at 139-40.   In making its ruling, the Supreme Court noted Congress' intent in enacting ERISA's broad preemptive scheme:

> Section 514(a) was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.

498 U.S. at 142.

Plaintiffs herein call the Court's attention to cases from other jurisdictions where state law claims have survived ERISA preemption.   For example, in Geller v. County Line Auto Sales, Inc., 86 F.3d 18 (2nd Cir. 1996), the Second Circuit allowed benefit plan trustees to sue an employer who fraudulently obtained benefits for the girlfriend of one its officers, even though she was not an employee and therefore not eligible for benefits.   The Court permitted common law claims for fraud and restitution, rejecting the district court's conclusion that the claims "related to" the ERISA plan because they "arose directly out of the allegedly improper administration of the plan." 86 F.3d at 22. The Court of Appeals concluded that the fraud claim would not

-30-

"compromise the purpose of Congress" and would not "impede federal control over the regulation of employee benefit plans." Id. at 23.

> We are persuaded further in this conclusion by the fact that although defendants improperly administered the plan, the essence of the plaintiffs' fraud claim does not rely on the pension plan's operation or management.

Id. at 23.

While it is certainly possible to find conflicting case law on the subject of ERISA preemption in other circuits, it is the First Circuit's precedent that is binding, and will control on Count V of Plaintiffs' Amended Complaint. Not only is First Circuit precedent clear and unequivocal, but it is also supported by well-established Supreme Court jurisprudence.

Plaintiffs have presented the Court with several documents outlining the history of their negotiations with Defendant in arranging and purchasing the Plan's insurance coverage. These documents, the subject of Defendant's Motion to Strike, were not included in the administrative record which was before DRMS when it reviewed and re-reviewed Dolan's claim. These documents demonstrate the marketing efforts employed by Defendant in order to induce Plaintiff D & H to purchase its insurance coverage. The crux of Plaintiffs' argument, as described previously, concerns the parties' discussions over the definition of "earnings." Plaintiffs allege that Defendant agreed to one definition of "earnings," then switched the meaning of the term after the 2006 audit. In order for the Court to assess Defendant's alleged "bait and switch," it

is necessary for the Court to interpret and analyze the operation of the Plan in its entirety.   The Court has engaged in this analysis already, in connection with Plaintiffs' Count IV, and has determined that Plaintiffs have misconstrued the significance of the term "earnings" to the operation of the Plan, primarily by ignoring the meaning of the phrase "any income you earn or receive from any form of employment" as it is used repeatedly throughout the Plan.

Not only must the Court interpret the language of the Plan in order to analyze Plaintiffs' fraudulent inducement claim, but the Court would also be called upon to interpret the operation of Plaintiffs' former insurance coverage because Plaintiffs assert that the old policy, the Guarantee Life policy, actually provided the coverage that they were falsely promised by Defendant. However, the Guarantee Life policy, while defining earnings as W-2 wages, also provides a benefit amount calculated as "The Insured Employee's Predisability Income, minus all Other Income Benefits (including earnings from Partial Disability Employment)."   "Other Income Benefits" include: "6. Earnings the Insured Employee earns or receives from any form of employment." Based on this provision of the Guarantee Life policy, it is by no means clear that a claim filed with Guarantee Life would have resulted in the benefit outcome of which Plaintiffs are so certain.

So, in order to rule on the fraudulent inducement claim, this Court would have to determine if Plaintiffs are correct in their interpretation of the Plan language, as well as in their interpretation of the Guaranty Life language. This analysis would have to be performed before the Court reviews the extrinsic evidence as to the representations or misrepresentations made by the agents of Boston Mutual in marketing their policy to Plaintiffs because, if Plaintiffs simply misunderstood how either or both of the policies worked, then there can be no fraudulent inducement on Defendant's part. All this clearly "relates to" the Plan and would require that "the court's inquiry must be directed to the plan." Carlo, 49 F.3d at 793. Because the Court's analysis of the Plan language would form a major part of any analysis of the parties' understanding, or misunderstanding, of the Plan language, the Court holds that Plaintiffs' claim for fraudulent inducement is preempted by ERISA.

While this result strikes the Court as harsh medicine to swallow, particularly if Plaintiffs were truly misled by Defendant as to the operation of the Plan, it is a result commanded by Carlo and Otero. In those cases, the First Circuit's stringent application of Ingersoll-Rand's preemption rule resulted an unsparing outcome for both plaintiffs, one of whom relied on his employer's certified retirement figure, while the other relied on a Spanish language version of the benefit plan circulated by his

employer.  In accordance with this precedent, summary judgment on Count V is granted in Defendant's favor, and partial summary is denied to Plaintiffs on this Count.

### Defendant's Motion to Strike

Because the Court will not engage in an analysis to determine whether or not Defendant purposefully befuddled Plaintiff D & H during the negotiations over the policy's purchase, the affidavits and exhibits documenting those negotiations are not relevant. Consequently, Defendant's Motion to Strike those documents is moot.

### Defendant's Counterclaim

Defendant's counterclaim demands that Dolan pay back $145,958.32 in benefits that were mistakenly paid out to her between January 1, 2002, and October 27, 2006, when DRMS notified her that her benefits were terminated because her post-disability income exceeded 80% of her predisability income.  In its Motion for Summary Judgment, Defendant ups the amount due, explaining in a footnote that Dolan's benefits were suspended April 18, 2006, after which an additional $17,703.25 was paid to her before the benefits were terminated.  However, Defendant has previously agreed to waive $12,000 of the total overpayment, bringing the grand total to $163,661.57.

The Plan provides that Defendant may recover overpayments under Section 5:

WHAT HAPPENS IF WE OVERPAY YOUR CLAIM?

-34-

> We have the right to recover overpayments due to:
> - fraud;
> - an error we make in processing your claim;
> - your receipt of other income amounts.
>
> If we determine that we overpaid your claim, then we require you repay us in full.  We will determine the method by which you will repay us.

Statutory support for Defendant's counterclaim comes from ERISA section 502(a)(3), 29 U.S.C. § 1132(a(3), which allows a fund administrator to seek "appropriate equitable relief."  In a case that examines this provision, Great-West Life & Annuity Ins. Co., v. Knudson, 534 U.S. 204 (2002), the Supreme Court provides an exegesis on the distinction between restitution in equity and in law.  To claim equitable restitution, the claimant must establish that "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  534 U.S. at 213.  If, however, the property sought by the claimant has been dissipated, no equitable lien can be established.  Id.  "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  Id. at 214.

Boston Mutual has made no showing that Dolan still has any funds from the overpaid benefits in her possession.  For their part, Plaintiffs have not addressed the counterclaim directly. Dolan claims that the cessation of Plan disability benefits imposed

financial hardship on her, forcing her to apply for Social Security – which makes it unlikely that she is in possession of an extra, undissipated $160,000.   Under the circumstances, the Court concludes that summary judgment cannot be rendered on the counterclaim.   Consequently, Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment on the counterclaim are both denied.

Conclusion

Defendant's Motion for Summary Judgment on Plaintiffs' Amended Complaint is hereby granted, resulting in the dismissal of all counts.   Defendant's Motion for Summary Judgment on its counterclaim is denied.   Plaintiffs' Motion for Partial Summary Judgment on Counts III, IV and V of their Amended Complaint and on Defendant's Counterclaim is also denied.

No judgments shall enter in this case until all claims are resolved.

It is so ordered.

_WE Smith_

William E. Smith
United States District Judge
Date: 9|2|09